**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AMERISTAR CASINO EAST CHICAGO,
LLC, MICHAEL PEGORARO, JAMES
MALECKY, LISA JUNG, and MONIR
DAVID,

              Plaintiffs,

      v.

UNITE HERE LOCAL 1,

              Defendant.

No. 16 CV 5379

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Defendant UNITE HERE Local 1 began boycotting plaintiff Ameristar Casino East Chicago, LLC, in response to a labor dispute. The other plaintiffs—Michael Pegoraro, James Malecky, Lisa Jung, and Monir David—are customers of the casino. All plaintiffs bring claims against Local 1 for secondary boycott activity under 29 U.S.C. §§ 158(b)(4), 187, and the individual plaintiffs also bring state-law claims for invasion of privacy. Local 1 moves to dismiss, arguing that the plaintiffs fail to state a claim for secondary boycott activity or for invasion of privacy, and that the invasion of privacy claims are preempted. For the following reasons, the motion to dismiss is granted in part as to the invasion of privacy claims and as to David's secondary boycott claim. The motion is denied as to the remaining plaintiffs' secondary boycott claims.

## I.     Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). The court must construe all factual allegations as true and draw all reasonable inferences in the plaintiffs' favor, but the court need not accept legal conclusions or conclusory allegations. *Virnich v. Vorwald*, 664 F.3d 206, 212 (2011) (citing *Iqbal*, 556 U.S. at 680–82). Local 1 argues that heightened pleading requirements should be imposed here because of the risks of burdensome discovery and of litigation chilling the union's First Amendment rights. But Local 1 cites no authority imposing a heightened pleading requirement in secondary boycott cases. Because secondary boycott prohibitions are directed only at coercive conduct and do not restrict First Amendment liberties, *see generally Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568 (1988), and even constitutional claims are subject to the usual pleading requirements of Rule 8, *see Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014), no heightened pleading requirement applies here.

In considering a motion to dismiss, the court may consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). But when a defendant attaches other documents to their motion to dismiss, "the court must either convert the 12(b)(6) motion into a motion for summary judgment under Rule 56 and proceed

in accordance with the latter rule, or exclude the documents attached to the motion to dismiss and continue under Rule 12." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). Local 1 has attached to their motion to dismiss an affidavit from their counsel, [13],[1] which includes exhibits represented to be the leaflets referred to in the complaint, an unfair labor charge that Local 1 filed with the National Labor Relations Board against Jung's restaurant, a report from the Orland Park Police Department regarding Local 1's visit to Jung's restaurant, an order of the Lake County Superior Court of Indiana in *Ameristar Casino East Chicago, LLC v. UNITE HERE Local 1*, Case No. 45D01-1504-PL-34, and a complaint and notice of hearing issued by the NLRB to Ameristar. Although leaflets are mentioned in the plaintiffs' complaint, and the NLRB charge and police report might be public records which can be considered on a motion to dismiss, Local 1 makes no argument for the centrality of any of its exhibits to the issues in this motion to dismiss. I decline to convert Local 1's motion to dismiss into a motion for summary judgment, and do not consider these documents.

## II.    Background

Ameristar operates a hotel and casino in East Chicago, Indiana. UNITE HERE Local 1, which represents approximately 200 Ameristar employees, began a boycott of Ameristar in March 2015 in response to a labor dispute between Ameristar and Local 1. Shortly thereafter, Ameristar began receiving complaints that Local 1 was sending letters to Ameristar's customers and calling their home

---

[1] Bracketed numbers refer to entries on the district court docket.

3

and cell phones to solicit them to boycott the casino. The following year, Local 1 began distributing leaflets at the homes of Ameristar customers and their neighbors, including plaintiffs Michael Pegoraro and Monir David. The leaflets identify the customer by name, label them as regulars of the casino, and ask the neighbors to join Local 1's boycott of Ameristar. Ameristar customers have asked Local 1 to stop distributing leaflets, sending letters to their homes, and making phone calls, but Local 1 has refused to do so.

Local 1 distributed the leaflets describing Pegoraro and his wife as regular customers of the casino within a one-block radius of their home. Pegoraro claims that, since their distribution, his reputation in the neighborhood has been diminished. His neighbors and family members have asked if he has a gambling problem, and a neighbor who was a customer of Pegoraro's business has ceased doing business with him since the leafleting commenced. After a few months, Local 1 also began distributing these leaflets to the private residence of his daughter and her neighbors.

Local 1 also distributed leaflets about plaintiff James Malecky, a customer of Ameristar and owner of an establishment called the Rockin' Horse in Oak Forest, Illinois. The leaflets were distributed at the office of the current mayor of Oak Forest and at the home of a village alderman. On at least one occasion, representatives of Local 1 entered the Rockin' Horse and attempted to solicit Rockin' Horse's customers to support the boycott of Ameristar. Another Ameristar customer, Lisa Jung, owns a restaurant in Orland Park, Illinois. In April 2016,

representatives of the union entered the restaurant at dinner time and began distributing leaflets to the restaurant patrons. The leaflets identified Jung, stated that she was a regular customer of Ameristar, and stated that she did not support Local 1's boycott. The union representatives refused to leave the premises until Jung threatened to call the police. A month later, representatives of Local 1 positioned themselves outside Jung's restaurant entrance, approached patrons of the restaurant, and distributed leaflets to the patrons. Local 1's representatives refused to cease their activities until ordered to do so by the Orland Park police. Representatives of Local 1 also entered a business in Chicago owned by another (unnamed) Ameristar customer. The representatives told employees that the owner could not give them raises because the owner was a "big gambler." Representatives also called the business owner's brother (on his home phone) to encourage him to convince the business owner to support's boycott.

Ameristar and the individual plaintiffs now sue Local 1, claiming that the union's activities were intended to harass and embarrass Ameristar's customers and their families.

## III.  Analysis

### A.  Secondary Boycott

The plaintiffs allege that Local 1 has threatened and coerced Ameristar customers to cease patronizing the casino and that it has also threatened and coerced individuals and entities in business relationships with Ameristar customers, with the object of forcing them to cease doing business with Ameristar customers. 29 U.S.C. § 158(b)(4) prohibits secondary boycott activity, and 29 U.S.C.

§ 187(b) authorizes private suits by "[w]hoever shall be injured in his business or property by reason" of violations of § 158(b)(4).[2] Local 1 argues that plaintiffs do not allege any coercive conduct or damages but maintains that the complaint merely describes the union's protected speech urging a consumer boycott.

1. *Coercive Conduct*

Section 158(b)(4)(ii)(B) provides that it is an unfair labor practice for a union: "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person." This section represents "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 719 (7th Cir. 2014) (quoting *NLRB v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 617–18 (1980) (*Safeco*) (Blackmun, J., concurring in part)). The touchstone of unlawful labor activity is "coercive, as opposed to persuasive, conduct." *Id.* at 722.

Section 158(b)(4) was meant to target secondary boycotts, including secondary picketing threatening neutral parties with substantial loss beyond the costs of customers persuaded to side with the union. *520 S. Mich. Ave.*, 760 F.3d at 719. Activity such as peaceful handbilling is lawful; under the constitutional

---

[2] Sections 158(b)(4) and 187 are also referred to as § 8(b)(4) of the National Labor Relations Act and § 303 of the Labor Management Relations Act, respectively.

avoidance canon, § 158(b)(4) is not to be interpreted as a restraint on First Amendment liberties. *Id*. (citing *DeBartolo Corp.*, 485 U.S. at 583–84). Handbilling represents an attempt at persuasion, but picketing is coercive because it "creates a physical barrier between a business and potential customers, thereby 'keeping employees away from work or keeping customers away from the employer's business.'" *Id*. 720 (quoting *Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15*, 418 F.3d 1259, 1265 (11th Cir. 2005)); *see also Safeco*, 447 U.S. at 618–19 (Stevens, J., concurring in part).

Conduct may also "be persuasive or coercive in ways that distinguish it from both handbilling and picketing." *520 S. Mich. Ave.*, 760 F.3d at 720. For example, union conduct can be viewed through the lens of trespass and harassment to gauge the level of coercion placed upon neutral targets. *Id*. at 721–22. "[T]respass and harassment may be more coercive than picketing" because such activities disturb neutral targets "from the inside." *Id*. at 722. Similarly, conduct repeatedly targeted at secondary employees, not customers passing by, "indicates an intent not to persuade, but simply to interfere." *Id*.

The Supreme Court has recognized the importance of residential leafleting. *See Martin v. City of Struthers*, 319 U.S. 141, 145–46 (1943); *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939). But "[e]ven with regards to handbilling, the Supreme Court has 'spoke[n] of a right to distribute literature only to one willing to receive it,'" *520 S. Mich. Ave.*, 760 F.3d at 724 (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)), and "has expressed greatest concern with unwanted messages

7

within a listener's own home." *Id.* (citing *Frisby*, 487 U.S. at 484 ("the home is different")). This is why the Supreme Court has approved regulations requiring canvassers to respect "no solicitation" signs at homes and businesses. *See id.* at 724–25 (collecting cases).

Alleged harassment—such as transmitting messages to an unwilling, captive audience—merits less First Amendment protection. *520 S. Mich. Ave.*, 760 F.3d at 724. First Amendment interests are "less fundamental when the speaker is cornering an unwilling audience in a private office space," *id.* (citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 781 (1994) (Stevens, J., concurring in part)), and the First Amendment does not provide "an unqualified constitutional right to follow and harass an unwilling listener." *Madsen*, 512 U.S. at 781 (Stevens, J., concurring in part). Union representatives are permitted to approach decision-makers of neutral businesses to express their views, even if they are initially uninvited, but "the Union's free speech interests start to wane, and the property and privacy rights of the neutral target become dispositive" once "that decision-maker says that she is not interested, and that the Union delegates are no longer welcome." *520 S. Mich. Ave.*, 760 F.3d at 725.

Here, plaintiffs have sufficiently pleaded facts raising an inference of coercive conduct. Local 1 argues that its conduct constituted handbilling, at most, and that plaintiffs' issue is with the content of the union's message, not its conduct. Citing to *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988), Local 1 asserts that handbilling is always permissible and protected speech

no matter the circumstances of its distribution. But *DeBartolo* held that peaceful, traditional handbilling "not involving nonspeech elements" and "unaccompanied by picketing" was not an unfair labor practice under § 158(b)(4). 485 U.S. at 574, 583–84. Later authority has recognized that even if handbill content is protected (as Local 1 argues here), the manner of distributing handbills may be coercive if it has aspects of picketing—i.e., when it resembles an attempt to interfere rather than persuade. *See 520 S. Mich. Ave.*, 760 F.3d at 731 (dissemination of fliers inside restaurant, even if content of fliers was protected, was "not necessarily protected as a matter of law"). The complaint takes issue not only with the content of the union's communications, but specifically with the union's conduct.

Local 1's visits to the businesses of Ameristar's customers involved more than traditional handbilling. Plaintiffs allege that representatives of Local 1 entered Malecky's and Jung's establishments in an attempt to solicit patrons to support Local 1's boycott. Distributing leaflets and approaching patrons inside a restaurant is "quite different from traditional handbilling, which occurs outside the premises," because "[h]anding out leaflets inside a restaurant seems much more like an attempt to interfere with patrons' enjoyment of the establishment than an effort to persuade them of a cause." *520 S. Mich. Ave.*, 760 F.3d at 731. And in Jung's case, the representatives allegedly refused to leave until she threatened to call police. Activity akin to trespass that can "get the police called in to intervene" could rise to the level of coercion. *Id*. at 722. Moreover, after this incident, Local 1 representatives again visited Jung's restaurant and, although they remained

9

outside, the police were called. Repeatedly visiting affiliates of targeted neutrals at their places of businesses after being clearly informed that the target is unpersuaded can be suggestive of trespass and harassment. *Id*. at 721–22.

Local 1's representatives also allegedly entered the business of another (unnamed) Ameristar customer and told employees that the owner was a "big gambler" unable to give them raises. This sufficiently alleges an intent not to persuade but to interfere with Ameristar's customers' businesses. And Local 1's alleged visits to the businesses of Ameristar's customers could "in a sense constitute tertiary labor activity" widening the labor dispute to include affiliates of customers of Ameristar, whose link to the labor dispute between Ameristar and Local 1 is "extremely attenuated." *Id*. at 731. In *520 S. Michigan Ave. Associates, Ltd. v. Unite Here Local 1*, the Seventh Circuit declared similar alleged conduct by the same union to be "exactly the sort of scorched-earth strategy that Section 158(b)(4)(ii)(B) was designed to avoid" because "[n]eutrals with only the most distant connection to a struck employer must not be reduced to collateral damage in a bruising labor battle." 760 F.3d at 731.

The allegations relating to phone calls to customers (and to their family members) and leaflet distribution at the homes of Ameristar customers (including Pegoraro and David), their family members, and their neighbors—and to members of their city's government—is a closer question. But at this stage, all reasonable inferences must be drawn in plaintiffs' favor, and they have plausibly stated a claim. Peaceful handbilling is not prohibited by § 158(b)(4). *See generally DeBartolo*

*Corp.*, 485 U.S. 568. But harassment or repeated trespass can violate the act. *520 S. Mich. Ave.*, 760 F.3d at 721–22. The complaint alleges that Ameristar's customers were called at home, and on their cell phones (including very late at night) and that in some cases, customers' family members were called on their cell phones. These calls continued even after customers asked Local 1's representatives to stop. "Allegedly frequent and repetitive phone calls (including some to people's homes)" can "support an inference that the Union did not intend to persuade but to force neutrals to take sides in its dispute." *Id.* at 721. Whether frequent calls rise to the level of coercion is a factual question not amenable to resolution in a motion to dismiss.

Distributing leaflets to a home appears more similar to traditional handbilling. But repeatedly distributing leaflets at a target's home after they have asked the union to stop, and distributing leaflets to a secondary target's neighbors, family members, neighbors of their family members, and the offices and homes of government officials in their town—persons with no connection to the casino— raises an inference that such activity was designed to harass and coerce rather than to persuade. *See, e.g., 520 S. Mich. Ave.*, 760 F.3d at 721; *Circle Grp., L.L.C. v. Se. Carpenters Reg'l Council*, 836 F.Supp.2d 1327, 1365–66 (N.D. Ga. 2011) (putting up banners in the targets' residential neighborhoods and in front of their children's schools, putting flyers in the mailboxes of neighbors, sending faxes to their children's schools, and sending flyers to colleagues raised a triable issue of fact as to whether union's conduct was harassing and coercive) (citing *DeBartolo*, 485 U.S. at

11

574; *Serv. Employees Int'l Union Local 525*, 329 NLRB 638, 639 n. 12, 681–82 (1999)). Plaintiffs have plausibly alleged coercive conduct by Local 1.

### 2. *Damages*

Local 1 also argues that the complaint fails to allege that the union's conduct caused damages. After detailing the factual allegations supporting the secondary boycott claim, the complaint alleges that plaintiffs "have thereby suffered great damage and injury to their business and property, including the loss of customers and goodwill, loss of profits during said illegal and unlawful acts, and the permanent loss of customers to competitors." [1] ¶ 25. In addition, Pegoraro specifically alleges that a neighbor ceased doing business with him since the leafleting commenced in his neighborhood. [1] ¶ 15. While mere conclusory allegations of damages without any factual basis are not sufficient to withstand a motion to dismiss, here the complaint has provided sufficient factual detail as to the union's alleged conduct—including repeatedly calling Ameristar customers and refusing to stop, entering plaintiffs' businesses and approaching patrons—and it is not a stretch to infer that such activity injured their businesses.

David, however, is an exception. Unlike the other plaintiffs, there are no allegations in the complaint asserting that David owns a business affected by the union's allegedly coercive conduct or that his property was injured. David's allegations relate solely to the leafleting of David's and his neighbors' homes, which does not give him a secondary boycott claim. *See* 29 U.S.C. § 187(b) (allowing private suits to be brought by "[w]hoever shall be injured in his business or

property" by § 158(b)(4) violations). David's secondary boycott claim must be dismissed.

### B.    Invasion of Privacy

Local 1 also seeks to dismiss the individual plaintiffs' invasion of privacy claims, arguing that they fail to state a claim and that such claims are completely preempted by 29 U.S.C. §§ 158(b)(4) and 187. As for preemption, "section 187(b) *completely* preempts state-law claims related to secondary boycott activities described in section 158(b)(4); it provides an exclusive federal cause of action for the redress of such illegal activity." *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 808 (7th Cir. 2009). Therefore, activities that arguably fall under § 158(b)(4)'s prohibition against secondary boycotts are completely preempted, even if articulated under a state-law claim. *See id.* at 806–08 (state law antitrust claim was completely preempted by the NLRA because it alleged activity arguably falling under the scope of §§ 158(b)(4)). The plaintiffs rely on the same alleged conduct by the union for their secondary boycott claims as for their invasion of privacy claims. As business owners, Pegoraro, Jung, and Malecky can state a secondary boycott claim for secondary boycott activity by Local 1. *See Rogers v. Tyson Foods, Inc.*, 308 F.3d 785, 788 (7th Cir. 2002) ("[T]he existence of a private right of action under federal law is an antecedent of complete preemption."). Pegoraro, Jung, and Malecky's state-law claims are dismissed as completely preempted. *See Smart*, 562 F.3d at 806–08. Because David has no antecedent private, federal action, David's invasion of privacy claim is not preempted.

To bring an action for invasion of privacy based on public disclosure of private facts,[3] a plaintiff must plead that: "(1) publicity was given to the disclosure of private facts; (2) the facts were private, and not public, facts; and (3) the matter made public was such as to be highly offensive to a reasonable person." *Miller v. Motorola, Inc.*, 202 Ill.App.3d 976, 978 (1st Dist. 1990) (citing Restatement (Second) of Torts, § 652D). The Restatement and some cases also require that the matter publicized "is not of a legitimate concern to the public." Restatement (Second) of Torts, § 652D(b); *Green v. Chicago Tribune Co.*, 286 Ill.App.3d 1, 5 (1st Dist. 1996).

Private facts are facts that plaintiff "does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close friends." Restatement (Second) of Torts § 652D cmt. b. The tort of public disclosure of private facts is meant to protect against the disclosure of "intimate . . . details the publicizing of which would be not merely embarrassing and painful but deeply shocking to the average person subjected to such exposure." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234 (7th Cir. 1993). Examples of private facts include sexual relations, embarrassing illnesses, intimate personal letters, matters related to domestic or familial relations, and mental health conditions. *See* Restatement (Second) of Torts § 652D cmt. b; *Miller*, 202 Ill.App.3d at 981; *Johnson v. K mart Corp.*, 311 Ill.App.3d 573, 579 (1st Dist. 2000); *Wynne v. Loyola Univ. of Chicago*, 318 Ill.App.3d 443, 453 (1st Dist. 2000); *Cordts v. Chicago Tribune Co.*, 369

---

[3] The complaint does not specify which invasion of privacy tort is asserted. The parties' briefs only address invasion of privacy through the publication of private facts.

Ill.App.3d 601, 609–10 (1st Dist. 2006). Not all personal information is a private fact. *See, e.g., Cooney v. Chicago Pub. Sch.*, 407 Ill.App.3d 358, 367 (1st Dist. 2010) (social security numbers are not private facts); *Mid-Am. Television Co. v. Peoria Hous. Auth.*, 93 Ill.App.3d 314, 319 (3d Dist. 1981) (receipt of public aid is not a private fact).

There is no liability for disclosure of facts that are a matter of public record, and "there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye." Restatement (Second) of Torts § 652D cmt. b; *see generally Cox Broadcasting Co. v. Cohn*, 420 U.S. 469 (1975) (under the First Amendment, there can be no recovery for disclosure of facts that are a matter of public record). Activity taking place in the public eye includes, for example, actions taken while walking down the street or while sitting at a sidewalk café. Restatement (Second) of Torts § 652D illus. 4 & 5; *see also Green*, 286 Ill.App.3d at 6 (in privacy terms, a public place is not necessarily a place devoted solely to the uses of the public but includes places accessible or exposed to the public) (citing Black's Law Dictionary 1107 (5th ed. 1979)). Activity outside of the public eye, for example, includes activity inside a hotel room or a private hospital room. *See* Restatement (Second) of Torts § 652D illus. 6 & 7; *Green*, 286 Ill.App.3d at 6.

The leaflets' statement that David is a "regular" at Ameristar's casino is not a private fact. Gambling at a casino is an activity that takes place in the public eye. A casino is a place frequented by many people and is exposed to the public. Anyone in Ameristar's casino could observe David gambling or observe whether David was a

"regular." *See, e.g., Harris v. City of Seattle*, No. C02-2225P, 2003 WL 1045718, at *5 (W.D. Wash. Mar. 3, 2003) (dismissing invasion of privacy claim based on filming of plaintiff at a casino because "[t]he fact that [plaintiff] gambled in a casino open to the public is not a private fact" as the plaintiff "clearly would expect persons to pass her by and observe her gambling"); *see also M & R Inv. Co. v. Mandarino*, 103 Nev. 711, 719 (1987); *Haynes v. Alfred A. Knopf, Inc.*, No. 91 C 8143, 1993 WL 68071, at *5 (N.D. Ill. Mar. 10, 1993) (plaintiff's drinking habits were not private facts where plaintiff openly drank at different taverns every weekend), *aff'd*, 8 F.3d 1222 (7th Cir. 1993). A statement that David is a "regular" customer of a casino offers no facts about David's finances, and there are no allegations that the leaflets stated David's specific financial information. David has failed to allege publication of a private fact and therefore cannot state a claim for invasion of privacy based on public disclosure of a private fact.[4]

## IV. Conclusion

The motion to dismiss, [12], is granted in part as to the invasion of privacy claims and David's secondary boycott claim, but is denied as to remaining plaintiffs' secondary boycott claims.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 12/19/2016

---

[4] Although the other individual plaintiffs' invasion of privacy claims are preempted, they would fail to state a claim for the same reason.

16