AMERISTAR CASINO EAST CHICAGO,
LLC and LISA JUNG,

        Plaintiffs,

        v.

UNITE HERE LOCAL 1,

        Defendant.

No. 16 CV 5379

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff Ameristar Casino East Chicago, LLC is in a labor dispute with defendant UNITE HERE Local 1, a labor organization that represents some of Ameristar's employees. Local 1 tried to get regular customers of Ameristar's casinos to join a consumer boycott of Ameristar and broadcasted—through leaflets, mailings, banners, and in-person contact—the fact that particular customers had not joined the boycott. Ameristar and Lisa Jung, a former Ameristar regular customer, claim that Local 1's actions violate the National Labor Relations Act's prohibition on coercive secondary labor activity. Local 1 moves for summary judgment. The motion is granted in part, denied in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citation omitted). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Laborers' Pension Fund v. W.R. Weis Co., Inc.*, 879 F.3d 760, 766 (7th Cir. 2018).

## II.    Facts

Ameristar operates an entertainment facility that includes a casino, restaurants, and a hotel. [51] ¶ 1.[1] Local 1 is a labor union that represents a bargaining unit of about 180 Ameristar employees, including bartenders, servers, and cleaners. [51] ¶ 3, Add'l ¶ 2. After two or three years of unsuccessful

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. Facts are taken from Local 1's response to plaintiffs' Local Rule 56.1 statement of additional material facts, [51], which contains all responses and replies to both Local 1's statement of facts (referred to as [51] ¶ __ ) and plaintiffs' statement of additional facts (referred to as [51] Add'l ¶ __ ). Any facts not properly controverted by admissible evidence are deemed admitted. *See* LR 56.1.

Plaintiffs moved to amend their statement of additional facts, in part to include other citations to support in the record. [52]. I denied the motion on the grounds that any amendment would require an opportunity for response, which would be costly and inefficient, [57], so I have not considered plaintiffs' amended statement of additional facts in resolving this motion.

Local 1 requested that I take judicial notice of documents from Ameristar's suit against Local 1 in Indiana state court and documents related to a National Labor Relations Board complaint against Ameristar, NLRB charges filed by Larry Kinoshita against Local 1, and a charge filed by Local 1 against Jung. [47-1]. None of the documents are relevant to resolving the issues raised in Local 1's motion for summary judgment, so I have not considered them.

negotiations over health insurance benefits in a new collective bargaining agreement, Local 1 began a consumer boycott of Ameristar in 2015. [51] ¶¶ 4–5. The purpose of the boycott is "to put economic pressure on Ameristar in order to cause Ameristar to agree to Local 1's proposal for a new collective bargaining agreement." [51] ¶ 5. Local 1's boycott strategy includes asking regular Ameristar customers to support the boycott and publicizing the names of regular customers who do not. [51] ¶ 9.

Plaintiff Lisa Jung, a restaurant owner, was a frequent and loyal customer of Ameristar's casino. [51] Add'l ¶ 3. In 2015, Local 1 began sending Jung mail about the labor dispute and boycott. [51] ¶ 43. Local 1 also left leaflets on the doors of homes in Jung's neighborhood. [51] ¶ 47. The leaflets and mailings generally contained information about the labor dispute or boycott and described Jung as a regular Ameristar customer who had not signed a pledge to support the boycott. [51] ¶ 47. In March 2016, after earlier unsuccessful attempts at contacting Jung in person and by phone, Local 1 representatives met Jung at her restaurant. [51] ¶¶ 44–46. The union representatives "[t]alked loudly" and asked Jung to stop patronizing Ameristar; Jung asked them to leave and not contact her again. [51] ¶ 46, Add'l ¶ 9; [47-6] at 21. Jung threatened to call the police, and the representatives left. [51] ¶ 46.

After that visit, Local 1 did not try to contact Jung by phone or in person again but continued distributing leaflets and sending mail about Jung's refusal to join the boycott to Jung's neighbors and acquaintances, businesses near Jung's

restaurant, customers of the restaurant, and pedestrians at a farmers' market. [51] ¶¶ 47–49, 52, 54. Some of the materials suggested the recipients ask Jung if she was a scab, and one mailing did not contain information about the boycott but rather notified recipients that a health inspection of Jung's restaurant found live mice and cockroaches on the premises. [51] ¶¶ 52, 54; Add'l ¶¶ 12, 15. Jung received two of the mailings, even though she had asked Local 1 to stop contacting her. [51] ¶ 54, Add'l ¶¶ 12, 15. And on several occasions, Local 1 displayed a banner at a farmers' market and on public sidewalks outside the strip mall where Jung's restaurant is located, asking readers to tell Jung to boycott Ameristar. [51] ¶¶ 51, 53. A nine-foot-tall inflatable rat stood beside the banner on one of these occasions. [51] ¶ 51, Add'l ¶ 16.

Three Local 1 representatives also returned to Jung's restaurant to distribute leaflets on the sidewalk outside the entrance. [51] ¶ 49. One of Jung's customers showed Jung the leaflet they were passing out, prompting Jung to call the police. [51] ¶ 49. The police told Jung that the owner of the strip mall could request that the union representatives leave. [51] ¶ 49. The property owner did just that after receiving a call from Jung, and the representatives left. [51] ¶ 49.

Dennis Tossi, Larry Kinoshita, Monir David, and Bryan Chiappetti are other former (or current) Ameristar regular customers who experienced similar conduct from Local 1. [51] ¶¶ 22, 33, 55, 62. Local 1 distributed leaflets and mailings about each of them (similar in content to the ones about Jung) to the customers themselves and the customers' professional and personal acquaintances, neighbors,

and others. *See, e.g.*, [51] ¶¶ 27, 36, 59, 69. In addition to the written campaigns, Local 1 took other action toward each customer.

Tossi, the executive director of a mental health facility, received a phone call in April 2016 from a Local 1 representative to discuss the Ameristar boycott. [51] ¶ 63, Add'l ¶ 27. During the brief call, Tossi asked the caller how he got his phone number, and when the question went unanswered, Tossi hung up. [51] ¶ 63. Local 1 did not speak with Tossi again after that. [51] ¶ 63. Union representatives did visit Tossi's workplace twice, but he was not present either time. [51] ¶ 65. On the second visit, the representatives were asked to leave, which they did, and Local 1 never returned. [51] ¶ 65. Twice, Local 1 representatives displayed a banner on a public sidewalk outside SIR Management, the parent company of Tossi's employer, that urged readers to ask Tossi to support the boycott. [51] ¶ 70, Add'l ¶¶ 30–31. Local 1 representatives also tried unsuccessfully to speak with SIR Management's CEO at work and distributed leaflets at the CEO's neighborhood block party that directed recipients to ask the CEO and his wife why they had not met with Local 1. [51] ¶ 68, Add'l ¶¶ 30, 32. Two Local 1 representatives went to Tossi's adult daughter's workplace and asked her whether they could speak to her about the boycott. [51] ¶ 72. Tossi's daughter declined and asked the representatives to leave, which they did. [51] ¶ 72.

Kinoshita, a dentist, received calls from Local 1 in April and May 2015; Kinoshita returned the calls and asked that Local 1 not call him again. [51] ¶ 57, Add'l ¶ 19. The subsequent leafleting and mailing campaign informing Kinoshita's

acquaintances of his failure to support the boycott included a letter that truthfully stated Kinoshita's dental license was suspended because he failed to pay income taxes and Kinoshita did not have an active controlled substance license, information gleaned from publicly available records. [51] ¶ 58. And twice, Local 1 displayed a banner on a public sidewalk near Kinoshita's office, reading "Tell Larry Kinoshita to Boycott Ameristar." [51] ¶ 60.

David, a truck driver, received a call from a Local 1 representative in April 2016, in which the representative said things like "I don't want you to go there no more" and "you better not fucking show up over there again" and concluded with David hanging up. [51] ¶ 35, Add'l ¶ 36; [49-3] at 270–71. A union representative also took photographs of a limousine and boat that were parked in David's home driveway. [51] Add'l ¶ 38; [50-1] at 21.

Chiappetti, owner of a meat company, spoke to Local 1 representatives on the phone twice, and representatives made two unsuccessful attempts to visit Chiappetti at work. [51] ¶¶ 24–25. Local 1 representatives also visited the company that handles packaging for Chiappetti's meat business and told the company they wanted Chiappetti to support the Ameristar boycott. [51] ¶ 26. Local 1 made phone calls to about five people who might know Chiappetti, including his brother, asking for help with persuading Chiappetti to support the boycott. [51] ¶ 29.

## III.   Analysis

### A.   Secondary Labor Activity

Secondary labor activity is not directed at Company A, with whom the union has its primary dispute, but rather Company B, a secondary, neutral entity that

does business with Company A. *See Int'l Bhd. of Elec. Workers, Local 501 v. N.L.R.B.*, 181 F.2d 34, 37 (2d Cir. 1950) ("The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employee's demands."). Sometimes the labor activity extends further down the chain, reaching entities that do business with Company B and so on. Here, the idea is that appealing to Ameristar's customers (who are neutral to Local 1's primary dispute with Ameristar) will cause the customers to put pressure on Ameristar to comply with Local 1's demands. Secondary labor activity can take many forms, from asking customers to speak with the primary target in support of the union to threatening the customers if they continue to do business with the primary target.

Section 8(b)(4)(ii)(B) of the National Labor Relations Act makes it unlawful for a union "to threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is forcing or requiring any person to cease . . . doing business with another person." 29 U.S.C. § 158(b)(4)(ii)(B).[2] The prohibition does not apply to "any primary strike or primary picketing." *Id*. Its concern is with secondary labor activity (and tertiary, quaternary, and beyond). *Id*. Anyone "injured in his business or property" by a violation is entitled to bring suit. 29 U.S.C.

_____

[2] Local 1 argues that § 8(b)(4) is an unconstitutional content-based restriction on speech, an argument that is foreclosed by Supreme Court precedent. *See, e.g., N.L.R.B. v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 616 (1980) (*Safeco*). Local 1 raises the argument only to preserve it.

§ 187(b).[3] The statute reflects "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *N.L.R.B. v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 617–18 (1980) (*Safeco*) (Blackmun, J., concurring in part).

### 1.    *Coercive Conduct*

Section 8(b)(4) prohibits unions from using coercive conduct against neutrals, but the word "coerce" is "nonspecific, indeed vague" and "should be interpreted with 'caution' and not given a 'broad sweep.'" *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 578 (1988) (citation omitted). Coercion has both subjective and objective components; a neutral must believe that her "only choice was to accede to the [u]nion's demands or else face substantial loss or ruin," and her belief must be an objectively reasonable one, meaning that "an ordinary person in [her] position would have felt coerced." *520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 725 (7th Cir. 2014). Coercion is often defined by contrast to persuasion—"mere persuasion" does not amount to coercion. *Id.* at 722 ("The Supreme Court has clearly indicated that coercive, as opposed to persuasive, conduct is the hallmark of unlawful labor activity.").

The classic example of coercive conduct is secondary picketing, an "isolated evil" that § 8(b)(4) was enacted to ban. *Safeco*, 447 U.S. at 612 (citation omitted). Secondary picketing is unlawful when it "threaten[s] neutral parties with

---

[3] The parties agreed to stay discovery on the question of damages and to brief first the other elements of the cause of action. [38]; [41].

substantial loss or ruin, beyond the costs from customers who are persuaded to side with the union and avoid a particular product of an employer involved in the strike." *520 S. Mich. Ave.*, 760 F.3d at 719. "[A] defining characteristic of picketing is that it creates a physical barrier between a business and potential customers." *Id.* at 720. Though picketing includes both speech and conduct, it is the conduct aspect that "often provides the most persuasive deterrent to third persons about to enter a business establishment." *DeBartolo*, 485 U.S. at 580 (citation omitted). For this reason, "picketing is qualitatively 'different from other modes of communication.'" *Id.* (citation omitted).

But coercive conduct should not be interpreted to include speech protected by the First Amendment. *See 520 S. Mich. Ave.*, 760 F.3d at 719; *see also DeBartolo*, 485 U.S. at 575, 583–88 (discussing constitutional-avoidance canon and deciding that the statute's intent was to not interfere with free speech). Coercion is distinct from persuasion. *DeBartolo*, 485 U.S. at 578–80. The question to ask when determining whether a union's conduct violates § 8(b)(4) is "whether the [u]nion's conduct . . . is coercive, as in the sense of a boycott or picket, or persuasive, as in the case of handbilling outside an establishment." *520 S. Mich. Ave.*, 760 F.3d at 720.

### 2. Harassment as Coercive Conduct

"Harassment, if severe enough, could rise to the level of coercive behavior." *Id.* at 721.[4] In *520 South Michigan Avenue*, the primary labor dispute was between

<hr>

[4] Local 1 argues that "harassment" is "too vague a term to satisfy the First Amendment." [50] at 12. Local 1 is correct that statutes prohibiting "harassment" can raise constitutional issues if not "authoritatively construed to avoid vagueness and overbreadth problems." *McCullen v. Coakley*, 134 S.Ct. 2518, 2538 n.8 (2014). But § 8(b)(4) does not prohibit

a union and a hotel, and the secondary, neutral targets of the union's conduct were organizations that planned to reserve blocks of the hotel's rooms. *Id*. at 711. The harassment at issue was that the union "continued contacting [neutral] targets even after they had made clear that they were not willing to receive [union representatives]." *Id*. at 721. The unwanted contacts included "physical invasions of private property," "frequent and repetitive phone calls (including to some people's homes)," and "threats to disrupt events." *Id*. The court acknowledged that trespass and harassment "do not create a symbolic barrier between a business and its customers in the way a picket line does," but reasoned that trespass and harassment may "disturb [neutral targets] from the inside" and be "as disruptive of a neutral organization's property, privacy, and business operations as any picket line." *Id*. at 722. So though an "isolated instance of harassment" likely would not be coercive, "repeated, sustained . . . harassment" could be. *Id*.

Section 8(b)(4) does not violate the First Amendment by including harassing behavior in its proscriptions because the statute "regulates conduct, not mere speech" and "address[es] the [u]nion's conduct . . . without reference to the content of its message." *Id*. at 723–24 (citation omitted). And speech is entitled to less First Amendment protection when it is directed to "an unwilling, captive audience." *Id*. at 724. Sometimes unlawful harassing conduct might be tangled with protected

---

"harassment," it prohibits coercion, and some conduct that we might call harassment can constitute coercion. *See 520 S. Mich. Ave.*, 760 F.3d at 721 ("To be clear, we are not suggesting that the Union committed trespass, harassment, or any other crime or tort; rather, we are using those categories as descriptive devices to gauge the level of coercion the Union may have placed upon neutral organizations.").

speech, but a restriction on the conduct is not the same as a restriction on the speech. Imagine, for example, walking down the street and being confronted by someone handing out leaflets. You decline to take the handout, but the leafleter follows you down the street, blocking your way and demanding that you take it. Though leafleting is a classic instrument of protected speech, the leafleter's method of conveying his speech, interfering with your ability to mind your business and walk down the street, is a different question. *See id.* at 723 ("Various forms of harassment are banned under state and federal law . . . Such laws unquestionably serve important state and public interests." (citation omitted)); *Gresham v. Peterson*, 225 F.3d 899, 908–09 (7th Cir. 2000) (upholding aggressive panhandling statute and noting that governments "routinely outlaw" harassing behavior like following a person while continually requesting a donation).

In *520 South Michigan Avenue*, the union's conduct toward some of the hotel's customers was harassing and coercive, but some conduct was not. For example, it was not coercive for the union to: visit a customer's office at least three times, where there was no evidence the union's representatives were asked to leave; distribute leaflets to a customer-convention's exhibitors and call some of the exhibitors at their homes; post on social media about a customer-non-profit and contact its conference registrants and sponsors; or use phone calls and emails to persuade a customer's sponsor, even where the union urged supporters to call a target despite observing that the target's voicemail inbox was full. *520 S. Mich. Ave.*, 760 F.3d at 727–28. In contrast, a reasonable inference of coercion exists

where, for example, the union: snuck into a customer's offices several times after being told the customer would not support the union's cause; called a customer every ten minutes for an hour; visited a customer's offices after being asked to leave; entered a customer's private meeting to shout "shame on you!"; distributed leaflets inside a restaurant; followed a customer's employee with signs as he visited the stores of affiliated retailers; and had a meeting with a customer that prompted a call to the police. *Id.* at 728–32. The line between these two categories of conduct—lawful persistent persuasion and coercive harassment—is defined at least in part by whether the unwelcome conduct interferes with the neutral's ability to conduct her business. *See id.* at 721–22 (explaining that harassment "relies on the interfering manner of communication" and can be coercive because it may "significantly disrupt a business").

### B.  Ameristar's Claim

Ameristar claims that Local 1's conduct toward four of its customers—Monir David, Larry Kinoshita, Dennis Tossi, and Lisa Jung—violated § 8(b)(4) and caused Ameristar damages. To succeed on its claim, Ameristar must prove that the union coerced at least one of the customers; the union used coercion with the intent of forcing the customer to stop doing business with Ameristar; the coercive conduct caused the customer to cease or reduce her business with Ameristar; and Ameristar was damaged by the conduct. *Id.* at 725.

Plaintiffs argue that the parties dispute whether the union's intent was to persuade or coerce and that the dispute over intent is one of fact that must be resolved by the jury. [48] at 26. The relevant intent is not disputed. *See* [50] at 20

n.5 ("It is undisputed that Local 1 intended to cause the Customers (and others) to boycott Ameristar, and to cause people not to patronize Fuji Restaurant. What is at issue is whether Local 1 used coercive conduct to accomplish that objective."). Whether Local 1 used coercive conduct can be decided as a matter of law. *See 520 S. Mich. Ave.*, 760 F.3d at 725–28. The issue of damages has been stayed by motion of the parties. [38]; [41]. So, with the exception of a causation argument related to David, Local 1's central argument is that its conduct was not coercive.[5] In response, Ameristar does not contend that any of the union's particular acts were coercive, but rather that the union executed an overarching campaign of harassment. [48] at 10–13. The union certainly waged a campaign, but the analysis of coercion must look at each target separately. *See 520 S. Mich. Ave.*, 760 F.3d at 725–32 (analyzing the union's conduct toward each neutral separately and finding a reasonable inference of coercion for some neutrals but not others).[6]

### 1.   *Monir David*

Local 1 argues that Ameristar cannot rely on conduct related to David to support its claim, because David never reduced or stopped his patronization of Ameristar. Local 1 raises two other arguments in favor of summary judgment on the David-related allegations—that David is not "engaged in commerce,"

---

[5] For the purposes of this motion, Local 1 does not dispute that its conduct caused Jung, Tossi, and Kinoshita to stop or reduce their patronization of Ameristar. [51] ¶¶ 42, 62, Add'l ¶¶ 18, 26, 35.

[6] Ameristar argues that Local 1's conduct toward another customer, Bryan Chiappetti, is relevant to show that the union's "overall conduct" was coercive, though it does not seek damages based on the Chiappetti-related conduct. Ameristar concedes that "Local 1 did not coerce, intimidate or threaten Chiappetti, or prevent Chiappetti from patronizing Ameristar." [51] ¶ 32. The union's conduct toward Chiappetti does not raise a reasonable inference that the union coerced any of the other customers.

§ 158(b)(4)(ii)(B), and that the union's behavior was not coercive. Local 1 abandoned the commerce argument in its reply brief. With respect to whether Local 1's conduct toward David was coercive, a jury could conclude that the statement to David on the phone that he "better not fucking show up over there [at Ameristar] again" and the subsequent trip to David's home to take photos of his vehicles were coercive. But the union is right that there is no evidence of causation.

In his August 2017 deposition, David testified that Local 1's conduct did not affect whether he went to Ameristar, how often he went, or how much money he spent there. [51] ¶ 41; [47-6] at 96–98. But Ameristar contends that David signed a boycott pledge a few weeks after his deposition and then stopped going. [51] ¶ 41.

Both of the documents that Ameristar cites in support of its contention—a June 2016 police report in which David's wife said that she and David had not been to Ameristar for almost a year and a September 2017 email reflecting what seems to be an online pledge to boycott Ameristar—are inadmissible.[7] David's wife's statement as captured in the police report, offered as proof that David actually stopped visiting the casino, is inadmissible hearsay. [49-3] at 181. And, anyway, his wife's statement predates the deposition and does not support Ameristar's contention that David signed a boycott pledge after his deposition. The purported boycott-signup email is also hearsay and has not been authenticated, either by

---

[7] Ameristar also cites two other documents, both from a certain deposition exhibit. The deposition exhibit contains a compilation of documents, and Ameristar pointed to the Bates numbers of two specific documents (UH-00088–89, UH-00095–96). But no documents in the exhibit bear those Bates stamps, so I assume Ameristar meant to reference the documents bearing the Bates stamps UH-00188–89 and UH-00195–96. Anyway, the two documents appear to be copies of a Local 1 postcard and its mailing list. [49-3] at 190–93. They shed no light on David's post-deposition business with Ameristar.

affidavit or deposition testimony. The email notes that it "was sent from a contact form on Indiana Gaming Alert" and, though it names David as the sender, lists "wordpress@indianagamingalert.org" as one of the sender's email addresses. [49-3] at 176. So the boycott-signup email raises questions about what it is, and those questions needed to be answered through some form of authentication testimony. *See* Fed. R. Evid. 901(a). Because both documents are inadmissible, it remains uncontroverted that Local 1's conduct did not affect David's business with Ameristar. S*ee Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment.").

Ameristar argues that "David testified that the Union ruined his name and that he felt threatened in his home because of [Local 1's] conduct," and from that, a jury could find that Local 1's conduct caused David to stop patronizing Ameristar. [48] at 22–23. But that David felt coerced does not result in a violation of § 8(b)(4) unless the coercion was successful in some sense, meaning it must have caused David to actually stop or reduce his patronization of Ameristar. *See 520 S. Mich. Ave.*, 760 F.3d at 725 (§ 8(b)(4) plaintiff "must prove that the targeted neutral ceased or reduced its business" with plaintiff). Because there is no admissible evidence that it did, Local 1 did not violate the act in its conduct toward David.

### 2. *Larry Kinoshita*

Local 1's conduct toward Kinoshita was not coercive. The union's direct contact with Kinoshita was minimal. The first time Kinoshita spoke to a Local 1 representative, on the phone, he said he did not want to be involved in the union's cause and asked the representative to never call him again. After that, Kinoshita's

contact with Local 1 was limited to three postcards, with months between each mailing. [51] ¶ 56, Add'l ¶ 24. Although the postcards were unwanted contacts made after Kinoshita made clear he was not interested in being persuaded, they do not amount to the kind of "persistent harassment" that qualifies as coercion. *See 520 S. Mich. Ave.*, 760 F.3d at 727. The coerciveness of harassing conduct hinges on the risk of disruption. *See id.* at 727–28 (explaining that passive social media posts are not coercive, unlike an "email bomb," which "at least plausibly could be disruptive of [the neutral's] activities"). Receiving an occasional postcard every few months cannot reasonably be understood to have been disruptive to Kinoshita.

Ameristar includes in its description of the "campaign of harassment" against Kinoshita the communications Local 1 made to Kinoshita's business associates, customers, and neighbors. These communications include distributing leaflets, sending letters or flyers through the mail, and peaceful bannering, none of which is coercive on its own and all of which are forms of protected speech. *See DeBartolo*, 485 U.S. at 583–84 (§ 8(b)(4) does not "proscribe peaceful handbilling, unaccompanied by picketing, urging a consumer boycott of a neutral employer"); *520 S. Mich. Ave.*, 760 F.3d at 726–27 ("Leaflets . . . are classic instruments of speech."); *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 391–92 (5th Cir. 1999) ("[L]etter writing . . . has even fewer potentially coercive, threatening, or restraining characteristics than does even handbilling or other in-person communication, and has been held, albeit in other contexts, to enjoy correspondingly greater First Amendment protection."); *Overstreet v. United Bhd. of*

16

*Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1211–18 (9th Cir. 2005) (peaceful bannering, unaccompanied by threats, physical barriers, or other restraints, was not coercive). Local 1 responds to what it labels Ameristar's "talking-about-me-is-harassing-me" argument by arguing that neutrals have no right to silence the union's speech to others and to hold otherwise would interfere with the rights of others to hear the union's speech. But I need not ask whether Local 1's campaign of peaceful communications to others is protected by the First Amendment because either way, the communications here do not amount to coercion. The union's truthful communications to others about Kinoshita do not raise an inference of coercive harassment, because there is no indication that any of the union's contacts with others disturbed Kinoshita's "property, privacy, or business operations." *520 S. Mich. Ave.*, 760 F.3d at 722.[8] Unlike, for example, receiving a phone call every ten minutes for an hour or being "email bombed," contacts to others of the kind at issue here pose little risk of interference.[9] Nor is

---

[8] One letter did relay information unrelated to the labor dispute—that Kinoshita had his dental license suspended and that he no longer had an active controlled substance license—but Ameristar does not contest that the contents of the letter were true. Just as "the act of passing out fliers with truthful content would not in itself constitute an unlawful labor practice," *520 S. Mich. Ave.*, 760 F.3d at 730–31, nor would mailing letters with truthful content.

[9] Ameristar quotes my opinion on Local 1's motion to dismiss to argue that "distributing leaflets to a secondary target's neighbors, family members, neighbors of their family members, and the offices and homes of government officials in their town—persons with no connection to the casino—raises an inference that such activity was designed to harass and coerce rather than to persuade." *Ameristar Casino E. Chicago, LLC v. UNITE HERE Local 1*, No. 16 CV 5379, 2016 WL 7339199, at *5 (N.D. Ill. Dec. 19, 2016). An allegation of a campaign designed to coerce raised an inference of coercion, and in turn, a plausible claim for relief. But now, after the benefit of discovery, Ameristar must come forward with evidence that the conduct constituted harassment so severe that it was actually coercive, and not merely an effort to persuade the recipients to join a boycott.

there any evidence that recipients of Local 1's communications about Kinoshita were unwilling to receive the union's message or that the communications were disruptive to any of the recipients.[10]

Ameristar argues that some of Local 1's communications to others about Kinoshita and the other customers constitute "indirect" contact of the customers because they urged recipients to contact them. But there is no evidence that the communications were so effective that the customers were inundated with so many phone calls or emails that it was the equivalent of a disruptive "email bomb" (or, in Kinoshita's case, that even any single recipient contacted him in response to Local 1's efforts). And even if there was, a flood of calls from recipients persuaded by the union's peaceful communications would be "the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do," *DeBartolo*, 485 U.S. at 580, so that may not even be coercive. Regardless, there is no evidence of such a result here.

Local 1's conduct toward Kinoshita did not violate the act.

### 3. *Dennis Tossi*

Tossi hung up on a union representative after a phone call, and later sued Local 1. The parties disagree about whether Tossi's filing of his lawsuit created, in a sense, a *de facto* "injunction"—meaning that the lawsuit put the union on notice that Tossi did not want to be contacted anymore and that any contact with Tossi past that point was unwanted and therefore harassment. A reasonable inference in

---

[10] Only one person, a neighbor of Chiappetti, asked Local 1 to stop distributing leaflets at his home, and Local 1 did not leave a leaflet at that person's home again. [51] ¶ 14.

Ameristar's favor is that hanging up and suing was enough to tell Local 1 that Tossi did not want to be contacted anymore. But that does not make any contact that followed automatically severe enough to be coercion.

The only union contacts with Tossi after the phone call were two visits to his workplace and two mailed postcards.[11] During the first visit to Tossi's workplace, the union representatives were told Tossi was not available, so they just left a message for him. There is no admissible evidence they were asked to leave.[12] During the second visit, the union representatives were asked to leave, so they did and never returned. There is no evidence that the union representatives created any disturbance during either of these visits—no evidence of yelling, calls to the police, barging into meetings, or refusing to heed the command to leave. *See 520 S. Mich. Ave.*, 760 F.3d at 727 (declining to find coercion where union representatives visited a neutral's office at least three times but there was no evidence that the representatives stayed after being asked to leave or entered the office instead of waiting outside). In terms of harassment, Tossi was not even present during the

---

[11] Ameristar says that union representatives also attempted to call Tossi twice more after the initial phone call in which Tossi hung up. But Ameristar supports its contention by citing to Tossi's deposition testimony that his secretary told him that the union called twice when he was unavailable, which is inadmissible hearsay. [49-3] at 248.

[12] Ameristar says that the union representatives were asked to leave during their first visit to Tossi's workplace, but again supports the contention with hearsay testimony from Tossi's deposition in which he relays what his secretary told him. [49-3] at 255–58. The other evidence Ameristar cites is a deposition exhibit that is a compilation of documents, and Ameristar does not specify which document it is citing to. Presumably, it means to point to the union's "walk sheets," but those are inadmissible because they have not been authenticated and lack foundation. Anyway, the "walk sheet" from the first visit indicates that the representatives were not asked to leave. [49-3] at 200.

visits, so the visits did not disturb him, and neither did the two postcards that he received in his mailbox months later.

The union's communications to others did not harass Tossi either. The union representatives' visit to his daughter's workplace did not create any disruption to Tossi's ability to go about his business. Nor was the visit coercive for any other reason. The undisputed facts are that the union representatives went to the daughter's office, asked for her, asked if they could speak to her about her father's relationship with Ameristar, and left after she said no and asked them to leave. There is no evidence that the union caused any kind of disturbance. It would be unreasonable for Tossi to feel coerced by a union's one-time peaceful request to speak with his adult daughter at her workplace. *See id.* at 720 (finding "uncontroversial" the proposition that "a union delegation generally may enter upon private property, even without prior permission, at least once for the purpose of informing and persuading a decision-maker of a neutral entity not to do business with a struck employer").

Nor did the union's conduct toward the CEO of the parent company of Tossi's employer coerce Tossi. The union displayed a banner on a public sidewalk outside the CEO's company and later distributed leaflets in the CEO's residential neighborhood. Ameristar argues that this constitutes tertiary activity and that tertiary activity is unlawful, since it is "exactly the sort of scorched-earth strategy that [§ 8(b)(4)] was designed to avoid." *Id.* at 731. Indeed, the union's conduct toward the CEO is tertiary activity—he is twice removed from the union's primary

dispute with Ameristar—and his link to the primary dispute is "extremely attenuated." *Id.* But not all tertiary conduct is coercive. Though the coercion threshold for a union's actions directed at a tertiary target may be very low, it is not so low as to include protected speech. *See DeBartolo*, 485 U.S. at 570, 588 (holding that the union's leafleting campaign against the mall, which was twice removed from the union's primary dispute with a construction company, was not coercive). The tertiary conduct condemned in *520 South Michigan Avenue* was trespass and disruptive harassment inside the tertiary targets' businesses, conduct not protected by the First Amendment. *See* 760 F.3d at 730–31. Here, however, the union's efforts directed at the CEO were leaflets and banners—protected speech, unaccompanied by trespass or harassment. Nor was the conduct coercive because it was harassing, since there is no evidence that the leaflets and banners interfered with the CEO's activities, much less Tossi's.

The remainder of the union's conduct related to Tossi—leafletting and mailing letters to Tossi's neighbors and acquaintances—is protected speech, and, like the Kinoshita conduct, there is no evidence that it rose to the level of actionable interference or harassment. The Tossi conduct did not violate the act.

### 4. Lisa Jung

In many ways, the union's conduct toward Jung is similar to that already discussed for Kinoshita and Tossi. The conduct consisted primarily of leafleting, mailings, and peaceful bannering. Once Jung made it clear that she did not want to

be contacted again,[13] the only direct contact the union made was through a few mailed postcards, spread out over the course of several months. Neither these postcards nor the mailings or leaflets directed at Jung's customers and other acquaintances interfered with Jung's ability to go about her business. This is true even though one of the mailings informed recipients of some unsavory findings made during a health inspection of Jung's restaurant, the truth of which plaintiffs do not dispute. *See id*. at 730–31.

The union's bannering was not harassing or coercive either. It is undisputed that each time the union displayed a banner outside Jung's restaurant, they did so on a public sidewalk, with a parking lot separating them from the restaurant. [51] ¶ 51. They held the banner in place and did not "parade or patrol" with it. [51] ¶ 51. And the union representatives holding the banner (three or four of them at a time) did not "chant or shout or physically confront people passing by," or even initiate conversations with passersby. [51] ¶ 51. Peaceful bannering of this sort is not coercive and did not prevent Jung from conducting her business. *See In Re United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 355 N.L.R.B. 797 (2010) (union did not violate § 8(b)(4) where "[t]he banners were held stationary on a public sidewalk or right-of-way, no one patrolled or carried picket signs, and no one interfered with persons seeking to enter or exit from any workplace or business").

---

[13] Plaintiffs point out that during Local 1's first in-person contact with Jung, a union representative "[t]alked loudly" (but did not actually yell), and Jung's restaurant was closed to customers at the time. [51] Add'l ¶ 9; [47-6] at 21. Loud talking, that fell short of yelling and did not influence any customers, did not reasonably threaten substantial loss or ruin to Jung's business and was not coercive.

The banners, held peacefully, did not erect a physical or symbolic barrier between Jung's customers and her restaurant—they were efforts at persuasion, an attempt to convince would-be customers to read the message and decide they did not want to eat at Jung's restaurant after all (or, once inside, voice an opinion supportive of the union to Jung). The presence of a large inflatable rat does not alter the analysis. *See Constr. & Gen. Laborers' Local Union No. 330 v. Town of Grand Chute, Wisconsin*, 834 F.3d 745, 751 (7th Cir. 2016) (Posner, J., concurring and dissenting) ("There is no doubt that the large inflated rubber rats widely used by labor unions to dramatize their struggles with employers are forms of expression protected by the First Amendment."); *Tucker v. City of Fairfield, Ohio*, 398 F.3d 457, 462 (6th Cir. 2005).

Although peaceful leafleting is not coercive when "unaccompanied by picketing," "the manner of distributing handbills may be coercive if it has aspects of picketing." *Ameristar Casino E. Chicago, LLC v. UNITE HERE Local 1*, No. 16 CV 5379, 2016 WL 7339199, at *4 (N.D. Ill. Dec. 19, 2016) (citation omitted). So the leafleting that occurred on the sidewalk in front of Jung's restaurant could be coercive if, like Jung says, the union representatives were blocking the entrance to the restaurant as they leafleted. If the union representatives were blocking the restaurant's entrance, customers might go elsewhere, not because they have been persuaded by the union's message, but because they were intimidated by the obstruction, and that would be like a picket. *See Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15, AFL-CIO*, 418 F.3d 1259, 1265 (11th Cir. 2005) ("The important

feature of picketing appears to be posting by a labor organization . . . of individuals at the approach to a place of business to accomplish a purpose which advances the cause of the union, such as . . . keeping customers away from the employer's business." (citation omitted)).[14] And picketing Jung's restaurant would be coercive. *See 520 S. Mich. Ave.*, 760 F.3d at 720.[15]

To support their assertion that the union representatives were blocking the restaurant's entrance, plaintiffs cite to Jung's sworn declaration, in which she says that the union representatives were "handing out literature a few feet in front of [her] restaurant's main entrance, effectively blocking the front door." [49-2] ¶ 5. Local 1 argues that Jung's declaration conflicts with her earlier deposition testimony, so the declaration should be excluded under the "sham declaration" rule. *See Abraham v. Washington Grp. Int'l, Inc.*, 766 F.3d 735, 741 (7th Cir. 2014) ("[A] deponent may not use an affidavit sworn to after a deposition to contradict deposition testimony without giving a credible explanation for the discrepancies."). But Jung's declaration does not contradict her deposition testimony. At her deposition, Jung testified that the union representatives were standing in front of the door, with their backs about two or three feet from the door. [50-1] at 15–16.

---

[14] Local 1 says that "[p]laintiffs do not claim that the ways in which Local 1 distributed leaflets . . . resembles picketing" or that "Local 1 engaged in actual picketing." [50] at 8. But plaintiffs do argue that Local 1's conduct toward Jung "is the functional equivalent of picketing" and correctly point out that the "manner of distributing handbills may be coercive if it has aspects of picketing." [48] at 12, 14 (quoting *Ameristar*, 2016 WL 7339199, at *4).

[15] The parties did not address whether Local 1's conduct toward Jung objectively threatened "substantial loss or ruin." *See 520. S. Mich. Ave.*, 760 F.3d at 725. Instead, they seem to assume that a picket would be sufficient to establish coercive conduct. Because the parties did not address the issue, neither will I.

That is consistent with Jung's declaration. That a customer was able to get around the representatives does not mean that the entrance was not obstructed in a way that was intimidating—people cross picket lines too. On the other hand, one of the union representatives who participated in the leafleting testified in his declaration that the union representatives "did not stand in the way or prevent people from entering [Jung's restaurant], or try to do so." [47-7] at 5. Because it remains in dispute whether the union representatives were blocking the entrance to the restaurant, summary judgment is not appropriate.[16]

Local 1's motion for partial summary judgment with respect to conduct regarding Jung is denied.

## C.    Jung's Claim

Jung brings a claim separate from Ameristar's, alleging that her business was injured as a result of the union's conduct. I have already explained that there is a material dispute as to whether the union's leafleting at the entrance of Jung's restaurant was coercive, but Jung's claim is missing a different element of a successful § 8(b)(4) claim—that the coercive conduct caused a customer to stop or

---

[16] Local 1 argues that Jung violated the NLRA by asking the strip-mall owner to have the police remove the union representatives, because "[a]n employer has no right . . . to exclude union representatives engaged in Section 7 activity from areas where it lacks an exclusionary property interest." *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 649 (7th Cir. 2012). Local 1 filed an unfair labor practice charge against Jung to this effect, which Jung settled. [51] ¶ 50. So, Local 1 argues, "[i]t does not make sense to argue that Local 1 violated the NLRA by engaging in conduct the Seventh Circuit recognizes as protected and with which Jung agreed not to interfere." [47] at 15. But the union conduct in *Roundy's* was peaceful handbilling—"the Union representatives didn't picket" and there was "no evidence that they obstructed or interfered with customers' access to or egress from the stores." 674 F.3d at 643. *See also N.L.R.B. v. Int'l Union of Elevator Constructors, AFL-CIO*, 902 F.2d 1297, 1303 (8th Cir. 1990) ("It would make little sense to hold that section 7 protected that which section 8(b) prohibits." (citation omitted)).

reduce her business with Jung. In her declaration, Jung says that "[a]t least one customer had to walk around [Local 1's] representatives to get into the restaurant" and "at least one regular customer [ ] ceased patronizing [her] restaurant after the Local 1 representatives blocked the front entrance." [49-2] ¶¶ 5, 10. Plaintiffs suggest this customer was one in the same. [51] Add'l ¶ 10. Jung's declaration does not establish that the union's conduct caused this customer to stop or reduce her visits to Jung's restaurant. It would not be reasonable for me to infer that the reason the regular customer stopped going to Jung's restaurant was the union's potentially coercive conduct, as opposed to any other reason (including that she was persuaded by Local 1). That is perhaps especially true where the particular customer walked around the union representatives while they were allegedly blocking the door, demonstrating that it was no barrier for her.

Local 1's motion for partial summary judgment on Jung's claim is granted.

## IV. Conclusion

For the reasons explained above, Local 1's motion for summary judgment, [45] [47], is granted in part, denied in part. Ameristar may pursue its claim that the union caused the casino damage when it blocked the entrance to Jung's business while persisting in unwelcome communication about its boycott.


ENTER:

Manish S. Shah
United States District Judge

Date: August 24, 2018